IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | Cr. No. 21-cr-423 |
| v. | U.S. District Judge Robert J. Colville |
| DEYANIRA ARAUJO | |

**DEFENDANT'S SENTENCING MEMORANDUM**

Defendant Deyanira Araujo – through his counsel, Robert J. Perkins – files this Sentencing Memorandum. The following table of contents reflects the core components of this Memorandum.

**TABLE OF CONTENTS**


I. INTRODUCTION .......... 1

II. DISCUSSION OF 18 U.S.C. § 3553(A)(1), "THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT" .......... 1

A. MS. STONER'S REPORT DETAILING DEYANIRA'S HISTORY AND CHARACTERISTICS .. 2

B. DEYANIRA COMPILED AN EXEMPLARY RECORD DURING THE 22 MONTHS THAT HE'S BEEN OUT ON BOND .......... 14

C. DEYANIRA HAS ABSOLUTELY NO PRIOR CRIMINAL HISTORY .......... 15

D. DEYANIRA'S OWN LETTER THAT HE PREPARED IN ANTICIPATION OF SENTENCING REFLECTS HIS SINCERE REMORSE AND MOTIVATION TO LEAD A LAW-ABIDING, PRODUCTIVE LIFE .......... 15

III. DISCUSSION OF ADDITIONAL SECTION 3553(A) FACTORS .......... 16

A. THE COLLATERAL CONSEQUENCES THAT WILL STEM FROM DEYANIRA'S FELONY CONVICTION THEMSELVES CONSTITUTE "JUST PUNISHMENT" FOR THE OFFENSE .......... 16

B. THE DATA SHOWS THAT THE SENTENCING GOALS OF SPECIFIC AND GENERAL "DETERRENCE" WILL BE BETTER SERVED THROUGH A NON-IMPRISONMENT SENTENCE .......... 20

C. THE SENTENCING GOALS OF PROVIDING THE DEFENDANT WITH NEEDED (1) "MEDICAL CARE" AND (2) "EDUCATIONAL AND VOCATIONAL TRAINING" WILL BE BETTER SERVED BY A NON-INCARCERATION SENTENCE ........ 22

D. DISCUSSION OF THE "CIRCUMSTANCES [AND CONTEXT] OF THE OFFENSE" PURSUANT TO SECTION 3553(A)(1) ........ 23

IV. DISCUSSION OF THE SENTENCING GUIDELINES ........ 24

V. SUMMARY OF GROUNDS FOR A DOWNWARD VARIANCE ........ 24

VI. CONCLUSION ........ 25

## I. INTRODUCTION

Deyanira Araujo pleaded guilty to conspiracy to make and making a false statement in connection with acquisition of a firearm. By pleading guilty, Deyanira waived his right to trial by jury and severely limited his appellate rights. Nonetheless, he entered his guilty plea willingly because he accepts the wrongfulness and seriousness of his conduct and understands the need to take responsibility for his actions.

This memorandum does not seek to excuse the conduct underlying Deyanira's guilty plea. He understands that he violated the law, and in doing so, committed a crime. Rather, the memorandum's primary purpose is to discuss the 18 U.S.C. § 3553(a) factors in order to assist the Court in determining a fair and just sentence.

In the end, Deyanira and his counsel respectfully submit that a non-incarceration sentence is appropriate in this case.

## II. DISCUSSION OF 18 U.S.C. § 3553(A)(1), "THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT"[1]

As our Supreme Court has explained, district courts should "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. U.S.*, 552 U.S. 38, 52 (2007).[2] It is thus appropriate to

[1] Courts commonly 'vary' from the guidelines based on their consideration of the § 3553(a) factors. *See Primer: Departures and Variances* (collecting cases), available on the United States Sentencing Commission website. A link to the primer is here: https://www.ussc.gov/sites/default/files/pdf/training/primers/2020_Primer_Departure_Variance.pdf (link last checked August 22, 2023).

[2] Internal citations and punctuation are omitted throughout unless otherwise noted.

vary beneath the guidelines when the defendant's unique circumstances warrant doing so. *See, e.g., U.S. v. Autery*, 555 F.3d 864, 871-875 (9th Cir. 2009) (affirming a downward variance – specifically from a guideline range of 41-51 months to 5 years of probation – based in part upon the district court's consideration of the defendant's unique characteristics). In this case, Deyanira respectfully submits that the Court should vary beneath the guidelines due to his unique characteristics – several facets of which are discussed next.

### A. MS. STONER'S REPORT DETAILING DEYANIRA'S HISTORY AND CHARACTERISTICS[3]

The discussion that immediately follows was written by the defense mitigation specialist, Lauren Stoner, MSW, LCSW, MPIA. A copy of Ms. Stoner's CV is attached as Exhibit A, while a copy of her report is attached as Exhibit B. Because Ms. Stoner's report is comprehensive and thoughtfully done, the defense has chosen to incorporate the full report into this Memorandum in order to help to better tell Deyanira's story.[4]

Now here is that report:

[3] While they are fundamentally consistent, there are some slight discrepancies between the mitigation specialist's report and the PSIR. Those discrepancies are immaterial. The defense further notes that Deyanira is oftentimes reserved and not always up for discussing sensitive information. Much of the information discussed here was learned over the course of many conversations between Deyanira and the defense mitigation specialist.

[4] Regarding the report's pagination, each report page references two page numbers: (1) Ms. Stoner's original pagination and (2) a page number in reference to the page's position in this Memorandum.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

### B. Deyanira compiled an exemplary record during the 22 months that he's been out on bond

When this case was originally filed in October 2021, Deyanira turned himself in on the arrest warrant. He was released on an unsecured bail. Deyanira has been out on an unsecured bail since. Probation never moved to modify or revoke his bail. Indeed, "[p]retrial services records indicate the defendant has complied with all Court ordered conditions of release" during the 22 months that this case has been pending. *See* PSIR ¶ 8. Deyanira's law-abiding behavior over the past two years demonstrates an ability to comply with court-ordered conditions. It also proves that Deyanira can and will comply with the terms of a non-incarceration sentence if allowed to remain in the community.

Equally important, during this two-year period (and with the help of the Probation Office and the defense mitigation specialist), Deyanira has made meaningful progress toward obtaining a deeper understanding of his mental health needs. He has also made an effort to seek out appropriate treatment – a process that is, and will continue to be, a work in progress.

All of these facts present additional grounds for a downward variance. *Cf. U.S. v. Huckins*, 529 F.3d 1312, 1315, 1317-19 (10th Cir. 2008) (affirming a downward variance, in part, due to defendant's lack of repeat offending after his arrest and his significant self-improvement efforts during the year and a half in which he waited to be prosecuted); *U.S. v. Munoz–Nava,* 524 F.3d 1137, 1149 (10th Cir. 2008) (affirming a significant downward variance because the district court considered, among other things, the defendant's "behavior while on a year-and-a-

half pretrial release," which was "found to be exemplary"); and *U.S. v. K*, 160 F.Supp.2d 421, 442 (E.D.N.Y. 2001) (Weinstein, J.) (noting that the Second Circuit "has recognized repeatedly that in deciding whether to depart downward a sentencing court may consider any pre-sentence rehabilitation that a defendant has demonstrated as well as the likelihood that probation rather than prison will facilitate a defendant's future rehabilitation") (*citing U.S. v. Maier*, 975 F.2d 944, 948 (2d Cir. 1992)).

### C. DEYANIRA HAS ABSOLUTELY NO PRIOR CRIMINAL HISTORY

Deyanira has no prior juvenile adjudications. *See* PSIR ¶ 32. No prior adult criminal convictions. *See* PSIR ¶ 33. Zero criminal history points. *See* PSIR ¶ 34. No prior arrests. *See* PSIR ¶ 38. No pending charges. *See* PSIR ¶ 37.

To the contrary, this is Deyanira's first lifetime arrest, first lifetime conviction.

### D. DEYANIRA'S OWN LETTER THAT HE PREPARED IN ANTICIPATION OF SENTENCING REFLECTS HIS SINCERE REMORSE AND MOTIVATION TO LEAD A LAW-ABIDING, PRODUCTIVE LIFE

Deyanira wanted to write his own letter to the Court, because he rightly wanted to help tell his own story. Deyanira's letter is thoughtful and compelling. A copy of his letter is attached as Exhibit C.[5] The letter shows what defense counsel knows – Deyanira is sincere about taking responsibility for his actions, and he is motivated to lead a productive, law-abiding life.

---

[5] The letter was emailed to counsel. Counsel, in turn, cut and pasted the email contents into a PDF. Counsel also made stylistic changes, specifically relating to spacing and paragraph indentations, to enhance clarity.

Of note, the letter touches on Deyanira's struggles. It depicts some of the painful experiences in his life. But by the same token, Deyanira doesn't make excuses or deflect blame on others for his predicament (despite, in counsel's assessment, having legitimate reasons for doing so).

The letter also reflects Deyanira's substantial efforts at introspection along with his advancing maturity. Deyanira has made a lot of progress since he was the 21-year-old who committed this crime. And he is rightfully proud of that.

## III. DISCUSSION OF ADDITIONAL SECTION 3553(A) FACTORS

### A. THE COLLATERAL CONSEQUENCES THAT WILL STEM FROM DEYANIRA'S FELONY CONVICTION THEMSELVES CONSTITUTE "JUST PUNISHMENT" FOR THE OFFENSE

A fundamental goal of sentencing is to impose "just punishment." 18 U.S.C. § 3553(a)(2)(A). In circumstances where the defendant will be inflicted with severe punishment *regardless of any imprisonment sentence*, courts can properly take that factor into account when determining whether incarceration is necessary to impose 'just punishment.' *See, e.g., U.S. v. Anderson,* 533 F.3d 623, 633 (8th Cir. 2008) (affirming the grant of a downward variance) (as reasons for granting a downward variance, the district court emphasized that the defendant already suffered serious harm as a result of his conviction that was independent of the direct sanctions imposed by the sentencing judge). Moreover, courts can specifically take into consideration any collateral consequences that stem from the fact of the conviction itself. *See U.S. v. Nesbeth*, 188 F.Supp. 3d 179, 180 (E.D.N.Y. 2016) (on the way to varying downwards from a guideline range of 33–41 months to a one-year

probationary sentence, the court relied heavily on the fact that defendant would already suffer a host of collateral consequences as a result of her conviction – thus making the additional sanction of incarceration unnecessary).

Indeed, in *Nesbeth,* Judge Block – in what can only be described as a masterpiece of judicial opinion writing – comprehensively discussed the myriad collateral consequences that flow from a criminal conviction. *See id.* at 181-93. Judge Block also explained why these collateral consequences are a relevant sentencing factor, which may serve as a proper basis for a downward variance (particularly in the case of a first-time offender). *See id.* What follows is an excerpt from the *Nesbeth* opinion:

> Chevelle Nesbeth was convicted by a jury of importation of cocaine and possession of cocaine with intent to distribute. Her advisory guidelines sentencing range was 33-41 months. Nonetheless, I rendered a non-incarceratory sentence today in part because of a number of statutory and regulatory collateral consequences she will face as a convicted felon. I have incorporated those consequences in the balancing of the 18 U.S.C. § 3553(a) factors in imposing a one-year probationary sentence.
>
> I am writing this opinion because from my research and experience over two decades as a district judge, sufficient attention has not been paid at sentencing by me and lawyers—both prosecutors and defense counsel—as well as by the Probation Department in rendering its pre-sentence reports, to the collateral consequences facing a convicted defendant. And I believe that judges should consider such consequences in rendering a lawful sentence.
>
> There is a broad range of collateral consequences that serve no useful function other than to further punish criminal defendants after they have completed their court-imposed sentences. Many – under both federal and state law – attach automatically upon a defendant's conviction.

> The effects of these collateral consequences can be devastating. As Professor Michelle Alexander has explained, "[m]yriad laws, rules, and regulations operate to discriminate against ex-offenders and effectively prevent their reintegration into the mainstream society and economy. These restrictions amount to a form of 'civi[l] death' and send the unequivocal message that 'they' are no longer part of 'us.'"
>
> ***
>
> Today, the collateral consequences of a felony conviction form a new civil death. **Convicted felons now suffer restrictions in broad ranging aspects of life that touch upon economic, political, and social rights**. In some ways, "modern civil death is harsher and more severe" than traditional civil death because there are now more public benefits to lose, and more professions in which a license or permit or ability to obtain a government contract is a necessity. Professor Alexander paints a chilling image of the modern civil death:
>
>> Today a criminal freed from prison has scarcely more rights, and arguably less respect, than a freed slave or a black person living "free" in Mississippi at the height of Jim Crow. Those released from prison on parole can be stopped and searched by the police for any reason ... and returned to prison for the most minor of infractions, such as failing to attend a meeting with a parole officer.... The "whites only" signs may be gone, but new signs have gone up—notices placed in job applications, rental agreements, loan applications, forms for welfare benefits, school applications, and petitions for licenses, informing the general public that "felons" are not wanted here**. A criminal record today authorizes precisely the forms of discrimination we supposedly left behind – discrimination in employment, housing, education, public benefits, and jury service.**

*Id.* at 180, 182-83 (emphasis supplied).

By way of further background, the following statistics and chart detail the profound impact that collateral consequences have on individuals convicted of crimes – consequences that will not only impact Deyanira's future ability to secure

adequate housing, education, and employment, but also impose a permanent social stigma:

# THE WIDE-RANGING AND OFTEN PERMANENT COLLATERAL CONSEQUENCES OF CRIMINAL CONVICTIONS

The collateral consequences of criminal convictions have a profound impact on people's lives. In the U.S., researchers have identified more than 40,000 collateral consequences that impose barriers to employment, housing, college admission, student loans, professional licenses, government benefits and services, voting rights, and more. The chart below breaks down the collateral consequences by category and type. The units of measurement refer to distinct laws, ordinances, rules, policies, and procedures that impose barriers on people convicted of a crime.






SOURCE: NATIONAL INVENTORY OF COLLATERAL CONSEQUENCES OF CONVICTION

Simply put, it is an awful outcome already that Deyanira will now be saddled with the scarlet letter of a felony conviction for the rest of his life. We don't need to incarcerate him also.

### B. THE DATA SHOWS THAT THE SENTENCING GOALS OF SPECIFIC AND GENERAL "DETERRENCE" WILL BE BETTER SERVED THROUGH A NON-IMPRISONMENT SENTENCE

The aims of sentencing include "afford[ing] adequate deterrence" and "protect[ing] the public from further crimes of the defendant …." *See* 18 U.S.C. §§ 3553(a)(2)(B)&(C). Respectfully, the better way to achieve these goals is to impose a community-based sentence, which is focused on supporting Deyanira's mental health treatment and encouraging him to further his education and employment prospects, rather than impose a more punitive measure such as incarceration. Said otherwise, a thoughtful and tailored community-based sentence will better serve the aims of "afford[ing] … deterrence" and "protect[ing] the public from further crimes of the defendant …."

Indeed, when viewed from the lens of recidivism risk and specific deterrence, research studies support the defense's request for a non-imprisonment sentence here. For instance, Dr. Valerie Wright, Ph.D., writing for the Sentencing Project, discussed the following findings that are relevant here:

> A series of studies have examined the public safety effects of imposing longer periods of imprisonment. Ideally, from a deterrence perspective, the more severe the imposed sentence, the less likely offenders should be to re-offend. A 1999 study tested this assumption in a meta-analysis reviewing 50 studies dating back to 1958 involving a total of 336,052 offenders with various offenses and criminal histories. Controlling for risk factors such as criminal history and substance abuse, the authors assessed the relationship between length

> of time in prison and recidivism, and found that longer prison sentences were associated with a three percent increase in recidivism. Offenders who spent an average of 30 months in prison had a recidivism rate of 29%, compared to a 26% rate among prisoners serving an average sentence of 12.9 months. The authors also assessed the impact of serving a prison sentence versus receiving a community-based sanction. Similarly, **being incarcerated versus remaining in the community was associated with a seven percent increase in recidivism**.

*See* Valerie Wright, Ph.D., *Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment*, pp. 6-7 (emphasis supplied).[6] In other words, as a general principle, people who receive a non-incarceration sentence are less likely to re-offend than those who are sentenced to prison.

Incarceration is also unnecessary from a general deterrence perspective. This is so because incarcerating Deyanira, in reality, will not deter others. The important point is that he got caught – and it is the certainty of punishment, rather than the severity of punishment, that has proven to be more effective in advancing deterrence. *See id.* (*citing* Daniel Nagin and Greg Pogarsky, *Integrating Celerity, Impulsivity, and Extralegal Sanction Threats into a Model of General Deterrence: Theory and Evidence,* CRIMINOLOGY Vol. 39, Issue 4 (2001)) (in the Nagin and Pogarsky article, these 'leading scholars on deterrence' found that "punishment certainty is far more consistently found to deter crime than punishment severity").

Moreover, and as discussed more fully above, the mere fact of Deyanira's felony conviction – along with its attendant avalanche of negative collateral consequences – itself can serve as a sufficient deterrent to other would-be

[6] A link to the article is available here: http://www.antoniocasella.eu/nume/Wright_2010.pdf (link last checked August 22, 2023).

lawbreakers. *See, generally,* Nagin and Pogarsky article (concluding that "the extra-legal consequences of crime seem at least as great a deterrent as the legal consequences").

### C. THE SENTENCING GOALS OF PROVIDING THE DEFENDANT WITH NEEDED (1) "MEDICAL CARE" AND (2) "EDUCATIONAL AND VOCATIONAL TRAINING" WILL BE BETTER SERVED BY A NON-INCARCERATION SENTENCE

Another sentencing goal is to "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." *See* 18 U.S.C. § 3553(a)(2)(D). Through the excellent work of the defense mitigation specialist, the defense has proposed specific, tailored treatment options aimed at helping Deyanira to access needed mental health treatment – treatment that will help Deyanira to establish a foundation from which he can do the work necessary to achieve his goals and live a meaningful, productive life. The mitigation specialist also proposed thoughtful recommendations aimed at helping Deyanira to further his education and job prospects. **Deyanira cannot access these supports and services from a federal prison cell**. This is another reason why a non-incarceration sentence makes sense here. *Cf. U.S. v. Grossman*, 513 F.3d 592, 597 (6th Cir. 2008) (in affirming a 54-month downward variance, the Appeals Court observed that the sentencing court adequately "accounted for § 3553(a)'s concerns that the sentence protect society and deter future criminal conduct" when it "opted to pursue those goals, not through a longer term of imprisonment, but through extensive counseling and treatment and an extensive period of supervised release").

### D. Discussion of the "circumstances [and context] of the offense" pursuant to Section 3553(a)(1)

The offense conduct is accurately described in the presentence report. *See* PSIR ¶¶ 10-16. As context, at the time of the incident, Deyanira – only 21 years old at the time – lacked any sort of stability in his life. He was staying with his sister and her young children. He slept on a couch (when he could sleep). Deyanira had few friends and only a tenuous connection to the East End neighborhood where he lived at the time. He struggled with serious mental health issues – conditions for which he was receiving no treatment or medication at the time. Deyanira also had no job and little money. In the midst of this environment, Deyanira was presented with an opportunity to make some money buying guns for others. Deyanira went for it and bought several guns for others in exchange for cash. Ultimately, Deyanira committed this crime out of a combination of financial desperation, poor youthful judgment, and altered thinking affected by his untreated mental illness.

Also of note, when later confronted by the police, Deyanira owned up to what he did.

Deyanira is now acutely aware of the gravity of his mistakes. He knows he did wrong, and he won't do it again. And he also knows that he will receive serious punishment. In fact, Deyanira has struggled throughout the pendency of this case with stress and anxiety, which stem in part from this prosecution. The fact that he's been forced to live with the specter of serious punishment coming his way for nearly two years is serious punishment in its own right.

## IV. DISCUSSION OF THE SENTENCING GUIDELINES

As noted, Deyanira has no criminal history points – making him a true zero-point offender, and triggering a criminal history category of 1. *See* PSIR ¶¶ 33-35. Deyanira's total offense level, meanwhile, is 13. *See* PSIR ¶ 31. That produces an applicable guideline range of 12-18 months, and places Deyanira in Zone C of the sentencing table. *See* PSIR ¶ 60. Of note, however, if the offense level were reduced by just 2 levels (to 11), that would produce a guideline range of 8-14 months and place him in Zone B; that, in turn, would put probation squarely within the guidelines. *See* USSG § 5C1.1(c)(3). Thus, while imposing a probation sentence does require a downward variance, that variance is extremely slight – and certainly warranted under the circumstances.

## V. SUMMARY OF GROUNDS FOR A DOWNWARD VARIANCE

The facts discussed above present a multitude of grounds that warrant a variance downwards. While many of the specific legal grounds for a variance were also discussed above, the defense summarizes and enumerates the many reasons to vary in the following list:

1. Deyanira's significant mental health issues, including depression and PTSD (issues that went largely unaddressed until recently on account of Deyanira's very challenging childhood, where he was raised in an impoverished and often unstable environment). *See U.S. v. Almenas*, 553 F.3d 27, 37 (1st Cir. 2009) (recognizing that a defendant's physical and mental disabilities, including depression, may justify a downward variance).

2. The fact that Deyanira experienced tremendous trauma and hardship throughout his childhood. *See U.S. v. McBride*, 511 F.3d 1293 (11th Cir. 2007) (affirming a downward variance of 67 months where the district

court found the defendant's history of abuse and abandonment by his parents to be one of the worst the court had ever seen).

3. The fact that Deyanira will have better access to a tailored mental health treatment plan outside of prison. *See Grossman*, 513 F.3d at 597.

4. Deyanira's documented ability to comply with the conditions of a non-incarceration sentence, as evidenced by the fact that Deyanira has complied with all court-ordered conditions of release during the 22 months he's been out on bond. *See Huckins*, 529 F.3d at 1315, 1317-19.

5. The severe punishment that will be imposed on Deyanira, independent of incarceration, by virtue of the collateral consequences that will follow his felony conviction in this case. *See Nesbeth*, 188 F.Supp. 3d at 180.

## VI. CONCLUSION

Deyanira is a work-in-progress – like all of us. Deyanira exercised poor judgment and made mistakes when he was 21 years old – like all of us. Deyanira will pay a permanent price for those mistakes as a result of the conviction itself. Incarceration under these circumstances would be disruptive, unhelpful, and ultimately counterproductive.

For all the reasons discussed above, Deyanira and his counsel respectfully submit that a sentence slightly below the sentencing guidelines – and specifically a non-incarceration sentence – is appropriate in this case. Indeed, a thoughtful and tailored probation sentence will be "sufficient, but not greater than necessary" to serve the goals of sentencing. *See* 18 U.S.C. § 3553(a).

Respectfully submitted:

/s/ Robert J. Perkins
Robert J. Perkins, Esq.
PA ID No. 200961

Rob Perkins Law, LLC
220 Grant Street, Suite 303
Pittsburgh, PA 15219
412.238.7820 (Phone)
412.291.3340 (Fax)
rob@robperkinslaw.com